```
United States District Court
Southern District of New York
```
—————————————————————————       **03 Cr. 1305 (JGK)**

**UNITED STATES OF AMERICA,**               <u>OPINION AND ORDER</u>

               - against -

**ARNOLD DALISAY**
                              **Defendant.**
—————————————————————————

**JOHN G. KOELTL, District Judge:**

The defendant Arnold Dalisay ("Dalisay"), a/k/a "Arnold Ray," was charged in a two-count superseding indictment (the "S3 Indictment") filed on March 10, 2005.[1] **The S3 Indictment charges twelve defendants, including Dalisay, with participating in a conspiracy in violation of 21 U.S.C. § 846, from in or about 2001 to up to and including in or about November 2003, to distribute fifty grams and more of methamphetamine in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). (**<u>See</u> S3 Indictment ¶¶ 1-2.)

Dalisay now moves to suppress evidence of a Federal Express package that was allegedly seized by the United States Customs Service (the "USCS") on March 4, 2003 and subsequently destroyed by the USCS on June 3, 2003. While the package has been destroyed, there is evidence concerning the package, including

---

[1] The suppression motion filed and later argued by the defendant was addressed to earlier superseding indictments. However, the return of the S3 Indictment has not changed the issues on this suppression motion and the Court will apply this motion to the S3 Indictment subsequently returned by the Grand Jury.

photographs of the package and its contents, shipping documents, and testimony by USCS agents.  The defendant argues that because he cannot examine and test the original package and its contents, the introduction of any evidence about the package would be highly prejudicial and should be precluded at trial as a means of sanctioning the Government for its destruction.  The Government argues that this evidence is admissible because the Federal Express package was not destroyed in bad faith and the destruction was not part of an effort to prevent anyone from reviewing the evidence in this case.  The Court held an evidentiary hearing on December 17, 2004 because the issue of sanctions depends on a case-by-case examination of the facts surrounding the destruction of the Federal Express package, including the Government's culpability for the loss of the evidence.  See United States v. Grammatikos, 633 F.2d 1013, 1019-20 (2d Cir. 1980).

Having reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact.

On or about March 4, 2003, a Federal Express package addressed to Arnold Dalisay was inspected by the USCS at the Federal Express Hub at the Ted Stevens International Airport in Anchorage, Alaska.  (See Transcript of December 17, 2004 Hearing ("Tr.") at 4, 6-8.)  The package allegedly contained two t-

shirts, three CD-ROMs, four deodorant containers, and a personal letter. (Tr. at 8.)

USCS Inspector Terence Sanders ("Sanders") examined the Federal Express package at issue. Sanders testified that, on a daily basis, he routinely inspects roughly 100 packages of the more than 30,000 Federal Express packages that arrive at the Federal Express Hub in Anchorage. (Tr. at 5.) Sanders routinely inspects these packages to determine the admissibility of cargo arriving in the United States and seizes contraband, including narcotics. (Tr. at 5-6.) Sanders has seized narcotics approximately 200 to 250 times in the course of his employment as a Customs Inspector, and he has seized methamphetamine approximately fifty-seven times, about fifty of which seizures occurred prior to March 4, 2003.[2] (Tr. at 6, 52.) Based on this experience, Sanders is familiar with the appearance of methamphetamine. (Tr. at 6.) Sanders has no investigative function and refers seizures to the USCS Office of Investigations ("OI").[3] (Tr. at 19-20.)

---

[2]While the transcript reflects that "15" seizures occurred prior to March 4, 2003, the Government confirmed with Sanders that this is a typographical error and that the number of methamphetamine seizures he was involved in prior to March 4, 2003, was approximately "fifty" seizures. (Gov't letter dated Jan. 7, 2005, at 4 n.2.)

[3]The USCS Office of Investigations, referred to throughout this Order as "OI," is now called the Office of Immigration and Customs Enforcement, or "ICE." (See Tr. at 20.)

Sanders testified that another USCS officer had selected the Federal Express package for a random inspection. (Tr. at 6-7, 25.) According to the handwritten Federal Express Airbill associated with the package, the package was sent from Rene Rhodas ("Rhodas") in the Philippines to Arnold Dalisay at 304 East 110 Street, Apartment 8, New York, New York. (Tr. at 6-7; Gov't Ex. 1.) Sanders testified that when he opened the package, he found that it contained two t-shirts, three CD-ROMs, a personal letter, and four deodorant containers. (Tr. at 8.) Sanders x-rayed the deodorant containers, which according to Sanders, revealed that three of the four containers held "foreign bodies." (Id.) Sanders took the Federal Express package to the lab at the USCS Office to extract the foreign bodies from the deodorant containers. (Tr. at 9.) Inside three of the four containers, Sanders found a total of six latex-wrapped packets, each holding a clear crystal substance. (Id.) Sanders probed one of the six packets and recognized the substance inside as methamphetamine. (Id.) Sanders performed an NIK A field test for narcotics on the substance in one packet, which field-tested positive for amphetamine.[4] (Tr. at 9-10.) Sanders looked at, and

_____

[4] While Sanders testified at one time that the substance field tested positive for methamphetamine, he also testified that the field test is used to test for amphetamines, and that the test is not a specific indicator for methamphetamine. (Tr. at 44, 47.) Sanders testified that he believed methamphetamine to be a property of amphetamine. (Tr. at 52.) To support this understanding, the Government has cited United States v. Berkery,

later tested, the substances contained in each of the remaining five latex-wrapped packages. (Tr. at 12-13.) Based on his experience seizing methamphetamine and a comparison with the packet he had already field tested for amphetamine, Sanders concluded that each of the other five packages also contained methamphetamine. (Tr. at 13.)

Sanders contacted OI for possible investigative or enforcement action. (Id.) Approximately twenty minutes to thirty minutes after contacting OI, Sanders received a facsimile from OI, which indicated that OI was declining enforcement action in the case in both Alaska and in New York. (Tr. at 14; Gov't Ex. 3501-A.) Because OI had declined any enforcement action, Sanders understood that the case would proceed no further than the seizure of the Federal Express package. (Tr. at 14.) Accordingly, Sanders effected seizure of the package, which involved entering the details of the seizure into a computer database known as SEACATS, and obtaining a 16-digit computer-generated forfeiture number ("FPF number"), which uniquely identified the seizure for tracking purposes. (Tr. at 15-16; Gov't Ex. 3501-B.) The FPF number generated for the Federal

---

919 F.2d 817, 819 (2d Cir. 1990), in which the Court noted that methamphetamine is a "member of the amphetamine family more commonly known as 'ice.'" Sanders testified that the substance turned a bright orange during the test, which was a positive indication for amphetamine. (Tr. at 47.)

Express evidence in this case was 2003319500021701.  (See Gov't Ex. 3501-B; Gov't Ex. 11.)

Before placing the package and its contents into an evidence bag, Sanders weighed the latex-wrapped packets and determined that those packets had a total weight of 38.7 grams.  (Tr. at 11; Gov't Ex. 7.)  Sanders also took several photographs, including: a photograph of the x-ray machine printout of the four deodorant containers (Tr. at 12; Gov't Ex. 4); a photograph of the four deodorant containers, with one container opened and showing a latex-wrapped package inside (Tr. at 12; Gov't Ex. 5); a photograph of latex-wrapped packages allegedly containing methamphetamine (Tr. at 10-11; Gov't Ex. 6); and a photograph of the six packages allegedly containing methamphetamine on a digital scale, which can be seen in the photograph as registering a weight of 38.7 grams (Tr. at 11; Gov't Ex. 7).  Sanders testified that he did not take photographs of the other items in the package —- the t-shirts, CD-ROMs, or the personal letter —- because he had concluded that these items were not relevant to the "actual smuggling of the narcotics."  (Tr. at 19.)  Sanders testified that there is no USCS policy with respect to the taking of photographs.  (Tr. at 50.)  Sanders also testified that although he had probably scanned the personal letter contained inside the Federal Express package, he could not recall reading

it and could not remember whether the letter was handwritten or typed. (Tr. at 18-19.) Sanders did not photocopy the letter, but testified that he would have photocopied and referred it to OI if the letter had contained information regarding monetary, narcotics, or immigration fraud. (Tr. at 19.) Sanders testified that he placed the Federal Express package and its contents into a sealed evidence bag and locked it in a safe, where it was to be retrieved by a USCS seized property specialist the next day. (Tr. at 16-17, 22.) Sanders also testified that, at the time of the seizure of the Federal Express package and in the months immediately following the seizure, he was not aware of any DEA investigation that involved defendant Dalisay in New York. (Tr. at 20-21.)

Charles G. Hunt ("Hunt") is a USCS Seized Property Specialist responsible for the safeguarding and destruction of seized property. Hunt handles approximately 12 to 15 seizures per week. (Tr. at 54-55.) He has no investigative duties for the USCS. (Tr. at 55.) On March 5, 2003, Hunt retrieved the sealed evidence bag from the vault at the Ted Stevens Airport in Anchorage. (Id.) Hunt testified that when he retrieved the evidence bag containing the Federal Express package, there were no signs of tampering. (Tr. at 56.) Hunt testified that he photographed the evidence bag and opened it in the presence of

another USCS officer, Nancy Mangum ("Mangum"). (Tr. at 56-57; Gov't Ex. 8.) Hunt removed the six latex-wrapped packages of methamphetamine and weighed these packages, recording a total weight of 38.0 grams, a 0.7-gram difference in the weight that was recorded by Sanders on March 4, 2003, the previous day. (Tr. at 11; 57-58.) Hunt photographed the six packages on a scale, and this photograph reflects that the scale registered a weight of 38.0 grams. (Tr. at 57-58, Gov't Ex. 9.) Hunt testified that he observed Officer Mangum field-test one of the six packages, and that she informed Hunt that the substance inside the field-tested package was methamphetamine. (Tr. at 58.) Hunt testified that he was involved in safeguarding methamphetamine prior to March 5, 2003, and is familiar with its appearance. (Tr. at 88.) Hunt also testified that although he was "not actually positive on the color" that appeared in the test vial during the field test performed by Mangum, he believed the color "turned a fairly bright blue." (Tr. at 74.) Hunt concluded, consistent with his experience, that the substance he saw inside the six latex-wrapped packages was methamphetamine. (Tr. at 89.) Hunt placed these six packages inside numbered evidence bag A0483070 and sealed the bag. (Tr. at 58-59.) Hunt weighed evidence bag A0483070 containing the six packages in order to determine its "shelf weight," which was 54.8 grams. (Tr. at 59, Gov't Ex. 10.)

Hunt separately inventoried the non-drug items contained in the seized Federal Express package, compared them with the items listed on USCS Form 6051S, a Custody Receipt (Gov't Ex. 11), and then put them into another numbered evidence bag, separate from the six latex-wrapped packages in sealed evidence bag A0483070. (Tr. at 58-59.)  He then brought the two sealed evidence bags containing all of the evidence seized from the Federal Express package to the USCS seized property vault in an office building in Anchorage.  (Tr. at 60.)

The USCS Fines, Penalties and Forfeiture ("FPF") Office in Anchorage is responsible for authorizing approximately 500 to 700 forfeitures each year.  (Tr. 121.)  The FPF Office employs three people: Officer Patrick McGownd ("McGownd"), the office supervisor; Seized Property Specialist Hunt; and a paralegal. (Tr. at 90.)  As part of the forfeiture process, the FPF Office generally sends two documents to interested parties regarding items that have been seized.  (Tr. at 91.)  The first document is a Notice of Seizure and Intent to Forfeit, which is a letter that describes the property seized and informs the sender and the intended recipient (the "interested parties") of the seized property that they have thirty days to contest the forfeiture. (Tr. at 92, 94; Gov't Ex 12; Gov't Ex. 3503-H.)  The second document, a Notice of Intent to Forfeit, is sent after thirty

days if there has been no response to the first document, and informs the interested parties that they have twenty days to contest the forfeiture and post a cash bond. (Tr. at 91, 95; Gov't Ex. 18; Gov't Ex. 3503-G.) Each of these notices is routinely prepared by the FPF Office paralegal, and occasionally by the seized property specialist, to be signed by McGownd. (Tr. at 93, 101.) If the USCS receives no response to these notices within the prescribed time periods, which is not unusual in cases involving the seizure of narcotics, the property is administratively forfeited and may be destroyed if the Government has no need for the property. (Tr. at 91, 100, 113, 121.)

In this case, the interested parties were the sender, Rene Rhodas, and the intended recipient of the seized Federal Express package, Arnold Dalisay. (Tr. at 91-92.) On or about March 13, 2003, the USCS Office in Anchorage sent one Notice of Seizure and Intent to Forfeit to Dalisay at 304 East 110th Street, New York, New York 10029, and another to Rhodas in the Philippines. (Tr. 92; Gov't Ex. 12; Gov't Ex. 3503-A; Gov't Ex. 3503-H.) The notices were prepared by the FPF Office paralegal and signed by McGownd. (Tr. at 104-05.)

After thirty days, the FPF Office had received no response from either defendant Dalisay or the sender of the Federal Express package. (Tr. at 95.) Accordingly, Notices of Intent to

Forfeit were sent to Dalisay and Rhodas on April 30, 2003. (Tr. at 95-99; Gov't Ex. 18; Gov't Ex. 3503-G.) On May 1, 2003, a copy of the first Notice of Seizure and Intent to Forfeit was also posted on a bulletin board at the USCS Office in Anchorage. (Tr. at 97-99; Gov't Ex. 19.) No response to any notice sent to Dalisay was ever received. (Tr. at 99-100.)

On May 13, 2003, the Notice of Intent to Forfeit that had been sent to Dalisay on April 30, 2003 was returned to the FPF Office in Anchorage by the U.S. Postal Service with a stamp indicating that delivery was "attempted not known." (Tr. at 99, 117; Gov't Ex. 17.) An envelope addressed to Rhodas in the Philippines was also apparently returned to the FPF Office. (See Tr. at 99.) To explain how the envelopes to Dalisay and Rhodas were addressed, McGownd testified that the paralegal at the FPF Office typically uses the airbill that accompanies a Federal Express shipment to prepare the notices sent to all interested parties. (Tr. at 105; Gov't Ex 1.) In this case, the paralegal had addressed all notices to defendant Dalisay at "304 East 110th Street," the address listed on the Federal Express Airbill (see Gov't Ex. 1), rather than "309 East 110th Street," the address listed on the Federal Express Commercial Invoice. (Tr. at 106; Gov't Ex. 2.) McGownd testified that it is the duty of the FPF Office to send these documents to the correct addresses, and

acknowledged that the documents sent to defendant Dalisay should have been sent to all potential addresses belonging to Dalisay according to the Federal Express documents, including the Federal Express Airbill and Commercial Invoice.[5] (Tr. at 105-06.)

At the time that the Federal Express package was seized in Alaska, DEA Agent Bryan Iula in New York was assigned to the drug investigation involving Dalisay. (Tr. at 125.) A New-York-based USCS agent, Ed Smith, was subsequently alerted to Agent Iula's investigation through a DEA intelligence report within a computer database. (Tr. at 126-27.) Smith contacted Iula on or about March 6 or March 7, 2003. (Tr. at 125-26.) Later the same day, Iula asked Smith to obtain the seized drugs and to transfer those drugs to Iula's custody in New York for use in the DEA investigation. (Tr. at 126-27.)

On or about April 28, 2003, in an effort to secure the seized package for use in the DEA's methamphetamine investigation in New York, OI Agent Russell Perras, who is based in Anchorage, Alaska, contacted Seized Property Custodian Hunt. (Tr. at 61-62.) Perras told Hunt that he wanted to take custody of the

_____

[5]The transcript of the evidentiary hearing before the Court refers to the address in Government Exhibit 2, the Federal Express Commercial Invoice as "390 East 110th Street" which, as indicated by defense counsel, appears to be a typographical error because the Federal Express Commercial Invoice actually reads "309 East 110th Street." (See letter from Jeffrey G. Pittell dated Jan. 7, 2005, at 2 n.1.)

package and its contents for transport to New York because "there was some interest in the property from New York." (Tr. at 62.) Hunt testified that although Perras came to retrieve the seized Federal Express package from the FPF Office on April 28, 2003, Perras did not ultimately take custody of the property because of a difference in the weight of the package on April 28, 2003 and the weight recorded when Hunt originally took custody of the evidence. (Tr. at 64.) When Hunt initially weighed the package on March 5, 2003, the package had a "shelf" weight of 54.8 grams. (Tr. at 59, Gov't Ex. 10.) However, when Perras weighed the evidence bag with Hunt, the shelf weight was allegedly 53.25 grams. (Tr. at 63; Gov't 3502-A.) A shelf weight of 53.25 grams on April 28, 2003 represented a difference of 1.55 grams when compared with the shelf weight of the evidence bag recorded on March 5, 2003. (Tr. at 63.) Because this weight discrepancy was outside the USCS variance tolerance level of two percent, Hunt maintained custody of the package so that a report of the discrepancy could be made to the USCS Office of Internal Affairs ("IA"). (Tr. at 64.) Despite the weight discrepancy, Hunt testified that the sealed evidence bag showed no signs of tampering when Perras came to retrieve it, and that the evidence bag was in the same condition at that time that it was in when Hunt sealed the evidence bag and placed it in the vault on March

5, 2003.  (Tr. at 63-64.)  Hunt testified that Perras may have

contacted him after April 28, 2003, but Hunt could not

specifically recall any conversation.  (Tr. at 89.)

Hunt spoke with IA Officer Jack Hynes by telephone about the

weight discrepancy.  (Tr. at 64; Gov't Ex. 3502-A.)  Hynes did

not come to the FPF Office to investigate the discrepancy and

Hunt was not aware of any action by IA regarding the change in

shelf weight.  (Tr. at 64-65.)

On April 29, 2003, Hunt sent an email to his supervisor, FPF
Officer McGownd.  (Tr. at 64-65, 101; Gov't Ex. 3502-A.)  In the
email, Hunt detailed the weight discrepancy, his subsequent
report to IA, and his discussion with IA Officer Hynes.  (See
Gov't Ex. 3502-A.)  After sending the email to his supervisor,
Officer McGownd, Hunt testified that he never received a request
for the preservation of the evidence in this case.  (Tr. at 68.)
On June 3, 2003, McGownd signed an administrative order, the
Declaration of Administrative Forfeiture, to forfeit the property
in the sealed evidence bags.  (Tr. at 100, Gov't Ex. 13, Gov't
Ex. 3503-B.)  McGownd testified that he authorized the forfeiture
of evidence in this case because he was unaware of any response
to the notices sent to Dalisay and Rhodas.  (Tr. at 100.)
On June 3, 2003, McGownd also signed USCS Form 4613, which
was an order to destroy the contents of the Federal Express
package.  (Tr. at 100-01, Gov't Ex. 14.)  The FPF Officer
routinely authorizes property that has been forfeited to the
Government, and for which the Government has no need, to be
destroyed.  (Tr. at 91.)  The FPF Office in Anchorage usually
performs a destruction of drug seizures once a month, but the
schedule of property destructions varies depending on the volume
of property seized and sometimes occurs no more than once a
quarter.  (See Tr. at 65.)
In this case, notwithstanding the DEA's request that the
Federal Express package be preserved, the evidence was destroyed
on June 3, 2003 pursuant to the order signed by McGownd.  The
Declaration of Administrative Forfeiture and the Order to Destroy
both referenced the property in the sealed evidence bags by the
16-digit FPF case number and contained a brief description of the
property to be forfeited and destroyed, including 38.7 grams of

methamphetamine, four deodorant containers, three CD-ROMs, two t-shirts, and one personal letter. (Gov't Ex. 13; Gov't Ex. 14.) Hunt, with the assistance of two other USCS officers, incinerated approximately 25 items, including the Federal Express package now at issue, pursuant to orders of destruction signed by McGownd. (Tr. at 65-66.)

McGownd testified that when he signed both the Declaration of Administrative Forfeiture and the Order to Destroy on June 3, 2003 with respect to the evidence at issue, he did not realize that the property was the same property referenced in Hunt's April 29, 2003 e-mail detailing the weight discrepancy and Hunt's report to IA. (Tr. at 101.) McGownd testified that if he had recognized this to be the same property referred to in Hunt's email, he would not have authorized the destruction of the property. (Tr. at 101-02.) McGownd also testified that, at the time he authorized the destruction of the Federal Express package and its contents, he was not aware that the evidence had any significance to a criminal investigation in New York, and that he did not intend to destroy evidence in a pending criminal investigation. (Tr. at 102-03.)

Similarly, Hunt testified that when he incinerated the evidence bags containing the drug and non-drug evidence that had been seized, he did not recognize these bags as containing the evidence that OI Agent Perras had requested. (Tr. at 67.) Hunt also testified that he did not recognize the evidence as the subject of his prior conversation with IA Officer Hynes. (Tr. at 67-68.) Had he recognized the evidence bags as those singled out by either Perras or Hynes, Hunt testified that he would have spoken with McGownd before destroying the evidence bags. (Tr. at 68.) Hunt testified that he did not tamper with the evidence, that he was not aware of a pending investigation of Dalisay in New York, or that the evidence bags were relevant to a criminal investigation. (Tr. at 68-69.) Hunt testified that he had no intention of preventing anyone from having access to the evidence for a later investigation. (Tr. at 69.)

DEA agent Iula, who investigated Arnold Dalisay and others, testified that he never received any evidence from the Federal Express package seized in Alaska. (Tr. at 127.) Iula testified that he would have "very much" liked to examine the contents of the Federal Express package. (Id.) Iula testified that he did not instruct anyone to destroy the property seized in Alaska. (Id.)

I.

The Court of Appeals for the Second Circuit has explained

the showing that a defendant must make to succeed on a claim

that the Government has failed to preserve evidence that is material to the defense:

> To establish a violation of the right to present a defense based on lost evidence, a defendant must show that the evidence was material and exculpatory, and that it was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984) . . . . Moreover, unless the defendant can show bad faith on the part of the state, 'failure to preserve potentially useful evidence does not constitute a denial of due process of law.' <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988); <u>Trombetta</u>, 467 U.S. at 488 . . . .

<mark>Buie v. Sullivan</mark>, 923 F.2d 10, 11-12 (2d Cir. 1990); <u>see also</u> <u>United States v. Rastelli</u>, 870 F.2d at 822, 833 (2d Cir. 1989); <u>United States v. Sattar</u>, No. 02 Cr. 395, 2003 WL 22510435, at *2 (S.D.N.Y. Nov. 5, 2003); <u>Gonzalez v. Fischer</u>, No. 01 Civ. 217, 2002 WL 31422882, at *6 (S.D.N.Y. Feb. 26, 2002); <u>United States v. Bin Laden</u>, No. S7 98 Cr. 1023, 2001 WL 30061, at *5 & n. 8 (S.D.N.Y. Jan. 2, 2001); <u>United States v. Baron</u>, No. 92 Cr. 898, 1996 WL 551625, at *5 (S.D.N.Y. Sept. 27, 1996), <u>aff'd sub nom.</u> <u>United States v. Pong</u>, 122 F.3d 1058 (Table)(2d Cir. 1997).

Even before the Supreme Court's decisions in <u>Trombetta</u> and <u>Youngblood</u>, the Court of Appeals for the Second Circuit had noted in <u>United States v. Grammatikos</u>, that "the appropriateness and extent of sanctions in [cases concerning Government failure to preserve discoverable evidence] depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its

nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." Grammatikos, 633 F.2d at 1019-20; see also United States v. Rahman, 189 F.3d 88, 139 (2d Cir. 1999)("When it occurs, the Government's loss of evidence may deprive a defendant of the right to a fair trial. Whether that loss warrants sanctions depends on the Government's culpability for the loss and its prejudicial effect." (citing United States v. Bakhtiar, 994 F.2d 970, 975-76 (2d Cir. 1993))); Sattar, 2003 WL 22510435, at *2 n.1 (collecting cases).

In this case, the defendant is not entitled to a preclusion order based on the facts established at the December 17, 2004 hearing. There is real evidence of the contents of the Federal Express package, including contemporaneous photographs and documents, as well as testimony about those contents. The package and its contents have been destroyed but that does not automatically lead to the conclusion that the evidence that does exist must be precluded. As in Grammatikos, the culpability of the Government was not great. The USCS agents who destroyed the package had no stake in this prosecution, and the circumstances surrounding the disposal of the package tend to refute any suspicions of evil motive or foul play. See also United States v. Morgenstern, No. 89 Cr. 0693, 1990 WL 74552, at *5 (S.D.N.Y. May 30, 1990)("To be sure, this case does not implicate 'evil motive or foul play' on the part of the Government . . . The record unfortunately does disclose culpability of a lesser form —- gross governmental negligence in the treatment of the [evidence] seized . . . ."), aff'd 933 F.2d 1108 (2d Cir. 1991). The facts established at the hearing indicate that the destruction of the Federal Express package was not in bad faith, and the defendant concedes that the Government's destruction of the Federal Express package was not in bad faith. (See Letters from Jeffrey G. Pittell dated Jan. 7, 2005 at 3 and Jan. 21, 2005 at 1).

The defendant relies on United States v. Bufalino, 576 F.2d 446, 449 (2d Cir. 1978), in which the Court of Appeals warned that where the destruction of evidence "is deliberate, sanctions will normally follow, irrespective of the perpetrator's motivation, unless the Government can bear the heavy burden of demonstrating that no prejudice resulted to the defendant." In Bufalino, the Court of Appeals affirmed the defendant's conviction despite the fact that an FBI agent destroyed back-up tapes of critical conversations because, among other factors, there was no reason to believe that the supplementary material would have been favorable to the defense. Id. at 450. The Court of Appeals has since explained that Bufalino was a case in which discoverable material was destroyed by a law enforcement agent at the conclusion of a fruitful investigation, knowing that indictment and trial were looming. Grammatikos, 633 F.2d at 1021. The Court of Appeals has also distinguished Bufalino as a case which involved "deliberate misconduct." Morgenstern, 933 F.2d at 1116.

In this case, in contrast to Bufalino, there was no deliberate misconduct and the circumstances of the destruction were removed from the agents involved in the investigation and prosecution of Dalisay. The Federal Express package was seized and destroyed by Customs Agents in Alaska who were not involved in, and indeed, were unaware of the investigation of Dalisay in New York. Moreover, Hunt and McGownd each testified that, at the time of the destruction of the evidence, they were unaware that the items that were destroyed had any relevance to a pending or future criminal prosecution. Each witness testified credibly that, had the witness realized that either the DEA or OI Agent Perras had requested the items being destroyed, the witness would not have destroyed the items.

Rather than argue that the evidence was destroyed in bad faith, the defendant contends that all evidence of the package should be precluded at trial because the Government's

destruction of the evidence was deliberate. In this case, the destruction of the Federal Express package and its contents was "deliberate" in the sense that its destruction was not inadvertent. However, the package was not destroyed to hamper the prosecution of the defendant and involved no deliberate misconduct. The evidence presented at the hearing shows that although the OI had declined investigation, it had asked the seized Federal Express package be held. There was also testimony that, on or about April 28, 2003, USCS Agent Perras had requested that the evidence be preserved. However, Perras did not ultimately take possession of the evidence and the record establishes that the USCS agents responsible for maintaining custody of the package did not associate the request for the preservation of evidence with the Federal Express package actually destroyed on June 3, 2003. On the spectrum of culpability, this was a case where the Government's culpability was not great. See Bakhtiar, 994 F.2d at 975-76.

Moreover, the defendant will suffer no meaningful prejudice as a result of the destruction of the contents of the Federal Express package because the evidence shows that the actual Federal Express package and its contents would not be useful to the defense. The available evidence provides compelling reasons to believe that the Federal Express package existed, that it was sent from the Philippines to Dalisay in New York, and that it contained methamphetamine secreted in latex-wrapped inserts in deodorant cans. This evidence includes the Federal Express Airbill and Commercial Invoice, the photographs showing the package and the deodorant containers and latex-wrapped inserts, the x-ray examination of the containers, and the contemporaneous observations of two USCS officers. There is no evidence that having the physical contents of the Federal Express package available for trial would be useful to the defendant.

This evidence should also be placed in the context of other potential evidence in the case. There is evidence that Dalisay made a post-arrest statement in which he admitted that he smoked crystal methamphetamine from co-defendant Jocelyn Epps and her friend Allegre; he smoked methamphetamine from the Philippines; he agreed to allow Epps and Allegre to use his address (although they allegedly did not tell him why); and that, sometime after the seizure of the Federal Express package, Epps and Allegre asked Dalisay to check on the status of the package sent to his address "so that they could sell its contents," and Dalisay refused to check on its status.  (See Def.'s Notice of Mot. to Preclude Evidence dated Sept. 1, 2004, Ex. B (DEA-6 report detailing Dalisay's post-arrest statement).)

The Government also proffers that the evidence will show that, on or about March 7, 2002, an undercover police officer called Dalisay's co-defendant, Jocelyn Epps.  Dalisay allegedly answered the telephone and then gave the phone to Epps; Epps and the undercover police officer then discussed a sale of crystal methamphetamine.  Epps allegedly told the undercover police officer that they did not have any product, but to call back later.  When the undercover police officer called later, Dalisay again answered the telephone and allegedly told the undercover police officer that they still did not have the product.  The Government contends that this evidence shows that Dalisay was working with Epps before the Federal Express package at issue was seized, and that the package seized and destroyed by the USCS was sent to Dalisay in furtherance of the narcotics distribution conspiracy.

Dalisay argues that he will be prejudiced because of his inability to test the substances contained in the Federal Express package.  He also argues that the results of the NIK field test were unreliable.  However, there is sufficient evidence to conclude that the substances in the latex packages secreted in the deodorant cans was methamphetamine, and there is no reasonable

basis to conclude that the production of the contents of the Federal Express package would have produced favorable evidence for Dalisay. The circumstances of the shipment of latex packages secreted in the deodorant cans show that the package contained illegal substances. This was confirmed by the identification of two customs officers who identified the substance as methamphetamine and those identifications were confirmed with two separate field tests. Inspector Sanders, who worked at the Federal Express Hub for six years performing seizures and inspections and who had seized methamphetamine about fifty times prior to March 4, 2003, testified that the substance was methamphetamine. (Tr. at 6, 9-13, 40-42, 51-52.) Hunt also identified the substance, consistent with his experience, as being methamphetamine. (Tr. at 88-89.) See United States v. Bermudez, 526 F.2d 89, 97-98 (2d Cir. 1975)(special agent allowed to testify as expert witness to identify cocaine where the witness had received special training, had four years experience, and had identified cocaine on thirty-five prior occasions). Although the defendant points to discrepancies in the recollections about the results of the field tests used by two separate customs agents, both agents recalled the separate tests as positive at least for amphetamine. The discrepancies in the recollections about the color of the substance produced in the test and the reliability of the tests can all be explored on cross-examination. They do not warrant excluding the evidence. See Trombetta, 467 U.S. at 490-91 (failure to preserve breath samples used for brethalizer tests introduced in evidence was not a violation of due process because, among other reasons, inaccuracy of test results could be demonstrated by other means, including cross-examination).

The defendant also contends that he will be prejudiced because of his inability to measure the precise quantity of methamphetamine contained in the Federal Express package. The

argument is unpersuasive.  The defendant has not been charged
with a substantive count of distributing or possessing
methamphetamine with the intent to distribute it in violation of
21 U.S.C. § 841(a)(1).  Rather, Dalisay is charged with
participating in a conspiracy, in violation of 21 U.S.C. § 846,
to distribute fifty grams or more of methamphetamine in violation
of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A).  The amount of
drugs is significant to the extent it was reasonably foreseeable
to Dalisay that the charged conspiracy involved the distribution
of fifty grams or more of methamphetamine.  See, e.g., United
States v. Martinez, 987 F.2d 920, 925-26 (2d Cir. 1993).  The
Government contends that although the actual weight of the
methamphetamine seized from the Federal Express package on March
3, 2003, can be estimated, and the evidence includes a photograph
of the scale weighing the methamphetamine, the Government will
not rely on that evidence alone in proving the quantity of
methamphetamine attributable to the defendant's participation in
the charged conspiracy.  (See Gov't Mem. dated Sept. 30, 2004, at
14.)  The sufficiency of the evidence to show that it was
reasonably foreseeable to Dalisay that the conspiracy involved
fifty grams or more of methamphetamine is an issue that can be
raised at trial.

The defendant argues that he will be prejudiced by his inability to offer potentially exculpatory evidence contained in the personal letter that he alleges was addressed to co-defendant Epps. However, there is no basis to conclude that the contents of the personal letter would have been helpful to the defendant. The package was addressed to the defendant and the fact that it contained a letter addressed to someone else would not be helpful to Dalisay, particularly in view of what the defendant himself admitted in his post-arrest statement: that he was asked by co-defendant Epps to retrieve the package, which he in fact refused to do. There is no basis to conclude that the letter itself contained any contents that would be exculpatory to the defendant with respect to the substance of the charged drug conspiracy. Sanders testified that he scanned the letter and would have photocopied it if it had contained information about narcotics. (Tr. at 19.) The Government admits that it was responsible for the destruction of the letter and both parties agree that the destruction of the evidence contained within the Federal Express package was not in bad faith. In addition, the Government agrees that, to the extent necessary, the Court should instruct the jury that it may draw an adverse inference against the Government from the fact that the Government destroyed the Federal Express package and its contents. (<u>See</u> Gov't Mem. of Law at 13.)

Finally, the defendant can still argue that the package and the personal letter belonged to co-defendant Epps. The defendant will be able to cross-examine the seizing agents, and will be able to argue that the jury should give little weight to the destroyed evidence. Indeed, the fact that a package addressed to Dalisay contained a substance that was identified as containing methamphetamine does not prove, standing alone, that Dalisay knew that the package contained methamphetamine, or that Dalisay was a participant in a narcotics conspiracy. However, it is clear that Dalisay is not harmed by the destruction of the Federal Express package and its contents. The evidence shows that the package and its contents would not have been helpful to Dalisay.

In sum, the defendant is not prejudiced because of the absence of the underlying package, and there is no basis to exclude the evidence that the package existed, including the photographic evidence, documents, and testimony by USCS agents that establish that it existed and that it was addressed to the defendant. Because the evidence was not destroyed in bad faith, and because the destruction of the Federal Express package and its contents does not prejudice the defendant, the defendant's motion to preclude the evidence is denied. However, because the Government was responsible for the destruction of the package and seeks to admit other evidence about it, the Court will give an

appropriate instruction to the jury regarding the destruction of the evidence and the adverse inference to be drawn against the Government as a result of the destruction.

CONCLUSION

For the reasons explained above, the defendant's motion to suppress evidence with respect to the Federal Express package is **denied**.

**SO ORDERED.**

**Dated:**     **New York, New York**
            **May** 17 **, 2005**

John G. Koeltl
United States District Judge